**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.D., individually and on behalf of all other persons similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>LOVEHONEY LLC,<br><br>       Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff L.D. ("Plaintiff") files this class action complaint on behalf of themselves and all others similarly situated (the "Class Members") against Defendant Lovehoney LLC ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.lovehoney.com (the "Website"), a website Defendant owns and operates.

2. Through its Website, Defendant markets and sells sex toys, lingerie, bondage equipment, and lubricants (the "Products").

3. Unbeknownst to consumers, however, Defendant collects various information when they visit its Website, including personally identifiable information ("PII") as well as other sensitive personal information, including information about their sexual life, sexual preferences, and sexual orientation.

4. Defendant aids, employs, agrees, and conspires with Facebook[1] to intercept such sensitive and confidential communications sent and received by Plaintiff and Class Members. Defendant's conduct, as alleged herein, demonstrates a wholesale disregard for consumer privacy rights.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

5. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"),because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

---

[1] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc.  Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

6.      This Court has personal jurisdiction over Defendant pursuant to Ninth Circuit precedent because of its contacts with the forum state.  First, by integrating the code that allowed a third party to wiretap communications, Defendant acted intentionally.  Second, Defendant knew that the harm would be felt in California because Defendant received billing and mailing addresses each time a customer completed a purchase.  Third, Defendant expressly aimed its conduct at California because Defendant, in the regular course of business, sells products through its interactive website and causes those products to be delivered to the forum.  More specifically, through the Website, Defendant sells products to California residents and ships those products to their home addresses.  Collectively, such factors are sufficient for the Court to exercise personal jurisdiction over Defendant.  *See Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085 (9th Cir. 2023).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## **THE PARTIES**

### *Defendant*

8.      Defendant Lovehoney LLC is a limited liability company incorporated in Texas with its principal place of business at 5156 Southridge Parkway, Ste. 110, Atlanta, Georgia 30349. Defendant owns and operates www.lovehoney.com, which sells adult toys nationwide.

### *Plaintiff*

9.      Plaintiff L.D. is an adult citizen of the state of California and is domiciled in Sacramento, California.

10.     Plaintiff L.D. has used Defendant's Website to discreetly purchase private, adult items.  In July 2023, for example, Plaintiff L.D. purchased adult toys and bondage equipment from the Website.  Plaintiff L.D. reasonably expected the nature of these purchases to be private and not disclosed to third parties.

11.     Plaintiff has an active Facebook account which they have maintained for numerous years.

12.     Pursuant to the systematic process described herein, Defendant assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information and sensitive information about their sexual life and private purchases.  Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.  As a consequence of these interceptions, Plaintiff has received targeted advertisements from Facebook marketing similar items that they purchased from the Website.

13.     By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and information about their private online purchases, including their sexual life and sexual preferences.

## FACTUAL ALLEGATIONS

**A.     Defendant Disclosed Sensitive, Private Information**

14.      Defendant assisted a third party with intercepting information that was sensitive, private, and personally identifiable.

15.     Americans have an expectation of privacy when it concerns private, consensual, adult activity.  This is especially true when the disclosure of such information can reveal an individual's sexual preferences and/or sexual orientation.

16.     Not only is this information confidential and sensitive, but it is also legally protected.  In 2020, California passed the California Privacy Rights Act, which expands the protections afforded by the California Consumer Privacy Act.  This includes expanding the term "sensitive personal information" to include "[p]ersonal information collected and analyzed concerning a consumer's sex life or sexual orientation."  Cal. Civ. Code § 1798.140(ae)(2)(C).

**B.     Background of the California Information Privacy Act ("CIPA")**

17.     The CIPA, Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

18.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
> Or

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
> Or

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
> Or

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

20.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**C.     Defendant's Website**

21.     Defendant is a global online retailer of adult products.

22.     Defendant's Website is accessible on mobile devices and desktop computers.

23.     Unbeknownst to consumers, Defendant aids third parties, including but not necessarily limited to Facebook, with monitoring and tracking their personal information as they navigate Defendant's Website.  This includes information concerning consumers' sexual life, sexual preferences, and sexual orientation.

24.     For example, when a consumer navigates Defendant's Website and selects the "LGBTQ+" tab, Defendant aids Facebook in intercepting that information:

Figure 1:



25.     Defendant does the same for all button clicks on its Website.

26.     Defendant has numerous clickable links on its Website concerning sensitive, private categories of information, including when consumers enter its "LGBTQ+ Hub," "STI Awareness" pages, and click on articles concerning intimate adult activities, as shown in Figures 2-4 below:

Figures 2-4:







27.     When consumers select the "Read more" tabs, Defendant assists Facebook in intercepting this information.

28.     Defendant does the same for each and every Product purchased on its Website.

29.     Facebook then leverages this information and sells it to third parties for targeted advertising purposes, as described below.

### D.     Facebook's Platform and its Business Tools

30.     Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

31.     In 2021, Facebook generated over $117 billion in revenue.[5]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[6]

32.     Facebook sells advertising space by highlighting its ability to target users.[7] Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[10]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[4] FACEBOOK, SIGN UP, https://www.facebook.com.

[5] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[6] *Id.* at 63.

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] https://www.facebook.com/business/news/Core-Audiences.

---

33.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."[14]

34.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

35.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  Facebook's Business Tools can also

---

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[16] See FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK,

---

track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  Advertisers can even create their own tracking parameters by building a "custom event."[18]

36.     One such Business Tool is the Facebook Pixel (the "Facebook Pixel").  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their website.  As the name implies, the Facebook Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read www.lovehoney.com—Defendant's own code and Facebook's embedded code.

37.     An example illustrates the point.  Take an individual who, at relevant times, navigated to www.lovehoney.com and, as Plaintiff did, added adult products to their virtual "shopping cart."  When that link was clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage.  As a result of Defendant's use of the Facebook Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Facebook caused the browser to secretly duplicate the communication with Defendant,

---

META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[17] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

38.     After collecting and intercepting the information described in the preceding paragraph, Facebook processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences.

**E.     How Defendant Disclosed Plaintiff's and Class Members' Sensitive Personal Information and Assisted with Intercepting Communications**

39.     Through the Facebook Pixel, Defendant shared customers' online activity, including their sensitive and confidential information and search results, including information related to their sexual preferences and/or sexual orientation.

40.     For example, as alleged above, when a customer entered www.lovehoney.com and added adult toys to their shopping cart, Defendant transmitted information relating to the specific customer's purchase of the item to Facebook via the Facebook Pixel.

41.     Each time Defendant sent this activity data, it also disclosed customers' personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Facebook admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

42.     A user who accessed www.lovehoney.com while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

43.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

44.     One such cookie was the "fr cookie" which contained, at least, an encrypted

Facebook ID and browser identifier.[20]   Facebook, at a minimum, used the fr cookie to identify users.[21]

45.    If a visitor had never created an account, an even smaller set of cookies was transmitted.

46.    At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[22]

47.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[23]   Otherwise, the c_user cookie is cleared when the browser exits.[24]

48.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[25]   If that happens, the time resets, and another 90 days begins to accrue.[26]

49.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[27]   If that happens, the time resets, and another 90 days begins to accrue.[28]

50.    The Facebook Pixel used both first- and third-party cookies.   A first-party cookie is "created by the website the user is visiting"—*i.e.*, www.lovehoney.com.[29]   A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*,

---

[20] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[21] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[22] *Id.*

[23] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[24] *Id.*

[25] *See id.*

[26] Confirmable through developer tools.

[27] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[28] Also confirmable through developer tools.

[29] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

---

www.facebook.com.[30]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

51.    Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant sent these identifiers alongside the event data.

52.    Defendant assisted Facebook with intercepting this information, including when it concerned information related to consumer's private sensitive information, including information about their sexual preferences and/or sexual orientation.

**F.    Plaintiff Never Provided Defendant or Facebook with Consent to Intercept Their Sensitive and Confidential Personally Identifiable Information**

53.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose their confidential and sensitive personally identifiable information.  Plaintiff was never provided with any written notice that Defendant disclosed the users of www.lovehoney.com nor were they provided with any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed to Facebook their sensitive and confidential personally identifiable information.

54.    Facebook likewise never received consent to intercept sensitive, protected information.  In fact, Facebook expressly warrants the opposite, promising to shield that information from disclosure.

55.    When first signing up, a user assents to three agreements: the Terms of Service,[31] the Cookies Policy,[32] and the Data Policy.[33]

---

[30] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[31] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[33] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

56.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[34]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[35]

57.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections,"  meaning information that "could be subject to special protections under the laws of your country."[36]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[37]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[38]

58.     Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us**."[39]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[40]

59.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[41]

60.     Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[42]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around

---

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..

[35] Id.

[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[37] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[38] Id.

[39] Id.

[40] Id.

[41] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[42] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

---

the kinds of information businesses can share with us."[43]  Facebook does not "want websites or apps sending us sensitive information about people."[44]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[45]

61.     These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[46]  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[47]

62.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons in California who have a Facebook account and who accessed www.lovehoney.com (the "Class").

64.     Plaintiff reserves the right to modify the class definition or add sub-classes as

---

[43] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565

[44] *Id.*

[45] *Id.*

[46] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[47] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

necessary prior to filing a motion for class certification.

65.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

66.     Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

67.     <u>Numerosity/Ascertainability</u>.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

68.     <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Class because Plaintiff used www.lovehoney.com and had their sensitive information disclosed to Facebook without their express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class members.

69.     <u>Adequacy</u>.  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

70.     <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u>  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on

grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

(a)   Whether Defendant intentionally assisted a third party with tapping the lines of internet communication between itself and customers;

(b)   Whether Defendant assisted a third party with surreptitiously recording personally identifiable information, sensitive personal information, and related communications;

(c)   Whether Facebook was a third-party eavesdropper;

(d)   Whether Defendant's disclosures of personally identifiable information, sensitive personal information, and related communications constituted an affirmative act of communication;

(e)   Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and sensitive personal information, resulted in a breach of confidentiality;

(f)   Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Pixel to record and communicate their FIDs alongside their confidential communications;

(g)   Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute; and

(h)   Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

71.   <u>Superiority</u>.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including

providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

72.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

73.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ."  Cal. Penal Code § 630.

74.     A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

75.     Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

76.     To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

77.     At all relevant times, Defendant aided, agreed with, and conspired with Facebook to track and intercept Plaintiff's and Class Members' internet communications while accessing www.lovehoney.com.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

78.     Defendant, when aiding and assisting Facebook's wiretapping and eavesdropping, intended to help Facebook learn some meaning of the content in the URLs and the content the visitor requested.

79.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel falls under the broad catch-all category of "any other manner":

    a.    The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating www.lovehoney.com;

    b.    Plaintiff's and Class Members' browsers;

    c.    Plaintiff's and Class Members' computing and mobile devices;

    d.    Facebook's web and ad servers;

    e.    The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate of www.lovehoney.com;

    f.    The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.lovehoney.com; and

    g.    The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.lovehoney.com.

80.     The information that Defendant transmitted using the Facebook Pixel constituted

sensitive and confidential personally identifiable information.

81.     As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through www.lovehoney.com without their consent.

82.     As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

<u>**COUNT II**</u>
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**

83.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

84.     The following items constitute "an electronic amplifying or recording device" under CIPA:

a.     The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating www.lovehoney.com;

b.     Plaintiff's and Class Members' browsers;

c.     Plaintiff's and Class Members' computing and mobile devices;

d.     Facebook's web and ad servers;

e.     The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate of www.lovehoney.com;

f.    The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.lovehoney.com; and

g.    The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.lovehoney.com.

85.    The data collected on Defendant's website constitutes "confidential communications," as that term is used in Section 632, because Class Members had objectively reasonable expectations of privacy with respect to their sensitive personal information.

86.    Defendant is liable for aiding and abetting violations of Section 632 by the third-party vendors.

87.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of Cal. Penal Code § 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT III
### Invasion Privacy Under California's Constitution

88.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

89.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

90.    At all relevant times, by using the Facebook Pixel to record and communicate their FID's alongside their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

91.     Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential, and that Defendant would not install wiretaps on www.lovehoney.com.

92.     Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive and confidential online communications.

93.     This invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and confidential online communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

94.     Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.     For a determination that this action is a proper class action;

b.     For an order certifying the Class, naming Plaintiff as representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.     For an order declaring that Defendant's conduct violated the statutes referenced herein;

d.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.     For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.     For punitive damages, as warranted, in an amount to be determined at trial;

g.     For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h.      For prejudgment interest on all amounts awarded;

i.      For injunctive relief as pleaded or as the Court may deem proper;

j.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k.      For an order granting Plaintiff and Class members such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff on behalf of themselves and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: February 16, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _/s/ L. Timothy Fisher_____

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese*
1330 Avenue of the Americas
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: jmarchese@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck*
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming

Counsel for Plaintiff and the Putative Class